15577

HOLLOWAY v. HOLLOWAY

(27 S. E. (2d), 457)

340 

 February, 1943. 

*Mr. Paul M. McMillan,* of Charleston, S. C., Counsel for Appellant, 

*Mr. Augustine T. Smythe* and *Mr. Arthur Ryttenberg,* both of Charleston, S. C., Counsel for Respondent, 

October 28, 1943.

CIRCUIT JUDGE E. H. HENDERSON, ACTING ASSOCIATE JUSTICE, delivered the unanimous Opinion of the Court:

This is an appeal from a judgment of the Court of Common Pleas for Charleston County, affirming a decree of the Domestic Relations Court.

The parties are husband and wife. Upon their marriage in 1941, the appellant took his wife to live at the home of his parents. Disagreement and irritation soon arose between her and her mother-in-law. The wife contends that as a result of constant nagging, interference, and even of abuse by her husband's mother, her life was made intolerable, and as her husband refused to provide her with a separate home she was obliged to leave him after six months.

The Judge of the Domestic Relations Court held that she had a right to leave, and ordered her husband to pay $18.75 a week for her support. Upon appeal to the Court of Common Pleas, his Honor, Judge M. M. Mann, affirmed the decree, and overruled the additional contention there made by the appellant that the Domestic Relations Court is a county Court, and that the Act establishing it is unconstitutional, there being no provision for first submitting the question to the electors of Charleston County.

The exceptions before us present three questions: Did the wife have a right to leave the home provided for her by her husband without forfeiting her claim to support? Was there error in requiring the appellant to pay as much as $18.75 a week for her support? Is the Act establishing the Domestic Relations Court constitutional?

The mutual rights and obligations of husbands and wives have been clearly set forth in the case of *State v. Bagwell,* 125 S. C., 401, 118 S. E., 767, 768:

"Marriage imposes upon the husband the duty at common law of providing the wife with a reasonably adequate and

suitable home and support. * * * But that the wife owes the reciprocal duty of living with the husband, who has discharged his obligation to provide her with a reasonably suitable home and support, is equally fundamental. The husband incurs no liability, either civil or criminal, for a failure or refusal to support a wife who has deserted a reasonably suitable place of abode chosen by him, or who without just cause or excuse has abandoned his bed and board.

* * * * *

"But in the case at bar the abusive language which, appellant says, did not justify the wife in leaving the marital abode chosen by the husband, was used by the mother-in-law. The wife marries the husband, not his mother. His first and paramount obligation is to his wife. Matt. XIX:5. The duty of the wife to forsake her family and cleave to her husband is no more imperative or sacred than the corresponding duty of the husband. Neither spouse has the right in mere wantonness or caprice, to demand the estrangement of the other from his or her parents. *Coulter v. Coulter,* 175 Mo. App., 1, 161 S. W., 281. But certainly, the wife's marital duty to put up with coarse and abusive language from a husband, whom she has taken for better or worse, may not be extended to cover the tongue of a cantankerous mother-in-law. As to what conduct of a husband's relatives will justify a wife in leaving the marital abode, it cannot be said that the courts have formulated a rule of general application. But as pointed out by the author of the note, appearing at page 633, Ann. Cas. 1914B: 'It may, however, be said, as the general effect of the decisions, that the duty of a husband to provide a home not only extends to the furnishing of material comforts in accordance with his means but requires the furnishing of a home wherein the wife is free from abuse, ill treatment, and unwarranted interference from members of the household. If such a home is not provided, the wife is justified in leaving, and not only is not guilty of

desertion in so doing but may charge the husband with constructive desertion.' "

And in the case of *State v. Free,* 158 S. C., 515, 155 S. E., 838, 839, it is said: "The obligation of a husband to his wife is paramount, and it is his duty to provide her a home in accordance with his means, where she may live, as the object of his care and comfort, without interference from members of the household."

It is needless to relate the facts of this unfortunate matter with any degree of detail, since the circumstances of each case of this kind necessarily differ widely. While some of the causes of irritation and annoyance, taken alone, might seem to be of a rather trivial nature, yet as is aptly said by the respondent, happiness or the opposite of it results from the accumulation of everyday petty occurrences. They must be considered as a whole, rather than as isolated incidents.

It will be sufficient to say that although the appellant promised his wife a separate home, this promise was never carried out. She was perfectly willing to live with him if he did so. Although there is some conflict in the evidence, it does appear that from the very beginning she was subjected to the unwarranted interference and persistent nagging of her mother-in-law. She complained to her husband and told him of her inability to stand it; and reminded him of his promise to provide her with a separate home, which he refused to do. He did offer her an apartment in the residence, but even this was not entirely apart from the other members of the family living there. The only offer he ever made to provide a really separate home was after she had left him, and it was coupled with the provision that the members of her family should not be allowed to visit her.

It is true that in many instances the relationship of a wife and her mother-in-law in the household is most cordial and pleasant, accompanied by mutual tact and love. Unfortunately that happy relationship did not exist in the present

case. A careful review of the evidence convinces us that the two Judges who have already heard this case have correctly held that by reason of the acts and words of the mother-in-law the life of the respondent became unbearable; and that they have properly applied the legal principles which govern such situations.

Taking up now the question of the amount ordered for support of the wife, it appears that the husband is a successful colored physician, and that his gross income for the year 1942, from his profession, from rentals and other sources, was $4,147.24. While he contends that a very large part of this was used by him for the purchase of equipment for his doctor's office, yet it must be remembered that the first duty of a husband is to support his wife in a reasonable manner, in accordance with his means. In view of all the circumstances, we do not think that there was error in ordering that $18.75 be paid by him for her support.

There remains the inquiry as to the constitutionality of the Act establishing the Domestic Relations Court.

Art. V, Section 1, of the Constitution is as follows: "The judicial power of this State shall be vested in a Supreme Court, in two Circuit Courts, to wit: A Court of Common Pleas having civil jurisdiction and a Court of General Sessions with criminal jurisdiction only. The General Assembly may also establish County Courts, Municipal Courts and such Courts in any or all of the Counties of this State inferior to Circuit Courts as may be deemed necessary but none of such Courts shall ever be invested with jurisdiction to try cases of murder, manslaughter, rape or attempt to rape, arson, common law burglarly [burglary], bribery or perjury: Provided, Before a County Court shall be established in any County it must be submitted to the qualified electors and a majority of those voting must vote for its establishment."

It is thus apparent that the General Assembly has full power to provide not only for County Courts, but also for

such Courts inferior to the Circuit Courts as it may deem necessary. While it is required that before a County Court may be established in any county the question be submitted to the electors, such a vote is not necessary in the case of an "inferior court."

The General Assembly, in 1936, provided for Domestic Relations Courts. Code, §§ 256-1 through 256-79. The real question, then, is to whether that Court is a County Court or an "inferior court."

No precise definition is given in the Constitution as to what constitutes a County Court. Such Courts were first established as far back as 1785, 7 St. at Large, p. 211. In 1900, under the present Constitution, the legislature enacted a law providing for County Courts. Code §§ 75-101. A reading of the Act shows a legislative intent to establish Courts patterned after the Circuit Courts, with civil jurisdiction limited as to amount, and excluding matters involving the title to real estate; and with criminal jurisdiction excluding the serious offences set out in Art. V, Section 1, of the Constitution. In other respects it has a very wide jurisdiction, quite similar to that of the Circuit Court, and the practice and procedure are generally the same as in that Court. A number of County Courts have been established by special Acts, all patterned after the Act of 1900.

Inferior Courts, on the other hand, have a special and limited jurisdiction. In the case of *State v. Fillebrown*, 2 S. C., 404, decided in 1870, under the Constitution of 1868, it was said: " 'All Courts from which an appeal lies are inferior Courts, in relation to the appellate Court, before which their judgment may be carried, but they are not, thefore, inferior Courts, in the technical sense of those words. They apply to Courts of a special and limited jurisdiction, which are erected on such principles that their judgments, taken alone, are entirely disregarded, and the proceedings must show their jurisdiction.' "

Under the present Constitution the same definition of an inferior Court prevails, as is shown by the case of *Grimball v. Parham Company,* 96 S. C.,.443, 81 S. E., 186.

A County Court must have jurisdiction covering the entire area of the county, but it does not at all follow that every Court having countywide jurisdiction is a County Court. In the case of *Glymph v. Smith,* 170 S. C., 486, 170 S. E., 913, 914, the Court stated: "We know of no constitutional provision that limits the power of the Legislature to fix the territorial jurisdiction of these 'inferior courts' as, in the circumstances, it may think proper, or that imposes upon the lawmaking body the duty to make the territorial boundaries of such courts to coincide with any political subdivision of the county."

It was held in the case of *Lexington Water Power Company v. Wingard,* 150 S. C., 418, 148 S. E., 366, 368, that a tribunal presided over by the clerk of Court in condemnation proceedings was a "Court of record" created by the General Assembly under its authority to establish inferior Courts; yet such a tribunal has countywide territorial jurisdiction. Indeed, where the General Assembly has not limited the jurisdiction of a magistrate's Court to only a portion of a county, its jurisdiction is countywide. *Baker v. Irvine,* 61 S. C., 114, 39 S. E., 252.

In the case of *Grimball v. Parham Company,* above, the Civil and Criminal Court of Charleston County was held to be an inferior Court in the constitutional sense, and the decision was based entirely upon the fact that it was one of special and limited jurisdiction, the territorial jurisdiction of the Court not being mentioned in the opinion.

It is not controlling that the General Assembly provided for the payment by the county of some of the officers of the Domestic Relations Court, nor that it imposed upon certain county officers duties in connection with the administration of the Court. *Glymph v. Smith,* above.

It would seem clear, therefore, that the true test as to whether a Court is a County Court or an inferior Court is not one of territory, nor the use of county officers, but whether it has a special and limited jurisdiction.

The Domestic Relations Court is one of special and limited jurisdiction. It deals solely with matters arising out of the family relationship and juvenile problems. It acts in this narrow field only, through its family Court and its children's Court, and falls far short of the extensive jurisdiction of a County Court.

Our conclusion is that the Domestic Relations Court is an inferior Court within the meaning of the Constitution, and that a vote of the electors was not a prerequisite to its establishment in the County of Charleston. It consequently had jurisdiction to hear and determine this case.

All of the exceptions are overruled and the judgment of the Circuit Court is affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE, and STUKES, and CIRCUIT JUDGE T. S. SEASE, ACTING ASSOCIATE JUSTICE, concur.